Bowen, J.
From what is shown by the pleadings and evidence in this case, there can be but little doubt that it was intended by Gordon 198] and Kyte, the two sons-in-law of Mrs. YBarrington, to obtain the family homestead for her and the minor children. That seems-to have been a leading object in effecting a sale through the administrator. The latter, though desirous of favoring a measure apparently proper and just, may nevertheless have had sufficient reason other than that to seek the order of sale. The actual condition of' the estate which he represented does not very clearly appear, either-as to the amount of debts due from it, or as to the assets in his-hands with which he could pay liabilities. A son of the deceased held a claim against his father’s estate, which it was understood' would be received by the administrator in part payment of the house and lot; and the sale accordingly took place, and the property was struck off to Gordon and Kyte. But when it was ascertained that this claim would not be taken by the administrator as part payment of the consideration money, Gordon declined to take the conveyance and make payment therefor, and Kyte was not able, pecuniarily, to-comply with the conditions of sale. The expedient, therefore, of substituting the administrator himself as purchaser, was, by his consent, adopted, and Gordon and Kyte released from their bid. Whether a design to acquire the property by this indirect method secretly actuated the administrator, we are. not prepared to decide. It is due to him to say, that the testimony.of the witnesses tends-very strongly to negative such design on his part. The rejection, however, by him, of Thomas Barrington’s claim as a payment upon the lot, naturally if not necessarily changed and defeated the plan of obtaining it for the widow and children. Gordon and Kyte did not want it for their own purposes. This the administrator most likely knew was the case, and if he wished to buy it himself, that act of rejection of the account would place him in a situation to-194] accomplish his purpose. When in this connection we *recur to the facts that the administrator, on the day of the sale to Gordon and Kyte, and before the court had passed upon his proceedings,. *195 executed a’deed to Kyte, omitting the name of his co-purchaser; that no purchase money was exacted by him, nor offered by the vendees; that no notes to complete the terms of the sale were made -out and given to him; that the deed to Kyte was never delivered to him, and no request, for several months, made of him to accept it .and complete the contract of purchase; and then, upon a suggestion from the purchasers that they would prefer to have him take the lot off their hands, his ready compliance with such suggestion, and the acceptance of a deed from Kyte alone to himself, we are not without some ground of apprehension that Alexander may have been governed, or at least influenced, by interested motives in making the .sale of the real estate. He might have excluded all unfavorable inferences against himself by again offering the property for sale, after the failure of Gordon and Kyte to pay for it. The effort of Kyte, in his deposition, to make it appear that Alexander, in taking the contract to himself, was induced so to do by the consent of the widow and family, does not remove from his acts all apprehensions of unfaithfulness. There still hangs over his proceedings a mystery, incompatible with an open, fair, and straight forward course. The inquiring mind still demands a more satisfactory explanation of the course he pursued. That point is raised by Kyte late in the progress of the case. He had been examined by the defendant nearly two years and a half before, without alluding to any similar .arrangement to that afterward mentioned by him. Gordon made no mention of anything of the kind; nor does Alexander, in his answer, claim that any such arrangement was made. Kyte stands .alone in his pretended recollection of it. He'is, probably, mistaken as to what occurred. At *any rate, his statement, if true, [195 makes no case against the infant children of Barrington, who were incompetent to consent thereto; nor against the widow and other members of the family, because nothing definite was settled at that family meeting except that Kyte communicated the fact that ho •■could not raise the money to pay his proportion, when Gordon replied to him that they had better get Alexander to take the lot ■off their hands; and Kyte assented to it. The first deposition of Kyte, procured by the defendant, shows this to have been all that transpired at the time; and it is undoubtedly the same meeting mentioned by him in his second deposition. The claim of the administrator is not, by this evidence, strengthened in any important particular.
*196 But whether there was, on the part of the administrator, any actual collusion or artifice employed to secure the property to him-1 self, need not essentially affect the determination 'of this case. He held a fiduciary relation to the estate of his intestate. The real estate belonging to it could by him be subjected to the payment of liabilities against the decedent in a particular manner, and upon well-defined conditions. For any other purpose he had no authority or power to divest the title to it. To guard the exercise of this-right from abuse, and to secure prudence and unbiased judgment-on the part of the administrator in the execution of this high trust, the policy of the law wisely prohibits him from deriving any gains from or interest in the land sold. He must sell to the highest bidder that ho can obtain, without becoming himself interested in such bidding. If the purchaser, to whom the land is struck off, fail to-comply with the terms of his purchase, the property should again be offered for sale. To permit the administrator to substitute-himself for a delinquent purchaser, would enable him to defeat all 196] genuine ^competition by receiving the bids of an irresponsible man, and afterward turn it to his own account by voluntarily-assuming the place of such bidder, and thus acquire any advantage which the ownership of the property may confer. This would be too dangerous a rule to govern administrators or any other class of trustees in the execution of powers over the trust property committed to their care. The fiduciary character of the administrator toward the land of the estate does not terminate as soon as ho makes a sale of it. He must obtain and hold securities for the payment of the purchase money. He may be required, in case of default of payment by the vendee, to inforce his securities against the land itself, and be compelled again to expose it to sale. This the statute provides for by authorizing credits to be given to purchasers at such sales of real estate, and mortgages to-be taken by the administrator on the same land sold. Until the title of the vendee to land sold him by an administrator has become-perfect by the payment of the consideration money, and the execution and delivery to him of a proper deed of conveyance, whereby the title passes from the heirs of the estate, unincumbered by any 'charge in favor of the administrator arising therefrom or pertaining thereto, and vests in the vendee, it can not with propriety be said that the administrator is absolved from his fiduciary office and duty over it. For all of the purposes above mentioned they must *197, 198 continue in full force, as well after the land is bid off at a public sale by a purchaser, as before. This principle, the correctness of which seems to us undeniable, is fatal to the right of Alexander to retain the property in controversy, although the sale to Gordon and Kyte may have been made bona fide.
This doctrine, so reasonable and just in its application to administrators, guardians, and all others clothed with the office, or in the performance of the duties of trustee, is well *settled by au- [197 thority. 1 Story’s Eq. Jurisp., secs. 321, 322, and cases cited by the author.
In Davoue v. Fanning, 2 Johns. Ch. 252, it was held that if a trustee, or person acting for others, sells the trust estate, and becomes himself interested in the purchase, the cestui que trusts are entitled, as of course, to have the purchase set aside,- and the property re-exposed to sale, under the direction of the court. And it makes no difference in the application of the rule that the sale was at public auction, bona fide, and for a fair price.
The case before the chancellor who announced this rule was a bill to set aside the sale of land, made by an executor to raise money to pay legacies, he pretending that the personal property was not sufficient to pay debts-and legacies. One of the legatees and the wife of the executor procured a third party to bid off the land within a limited price, for her benefit, and' in order to secure the estate to herself and children, independent of the husband. The chancellor thought that the fact that the executor was exercising the general powers of his trust for the benefit of his wife, was peculiarly calculated to touch and awaken the suggestions of self-interest. After examining the subject, and the cases relating to it, with what Judge Story calls “most exemplary diligence,” Chancellor Kent arrives at this conclusion, which he lays down as the.true rule to be observed, that, “ However innocent the purchase may be in the given case, it is poisonous in its consequences. The cestui que trust is not bound to prove, nor is the court bound to judge, that the trustee has made a bargain advantageous to himself. The fact may be so, and yet the party not have it in his power, distinctly and clearly, to show it. There may be fraud, and the party not able to prove it. It is to guard against this uncertainty and hazard of abuse, and to remove the trustee from temptation, that the rule does *and will permit the cestui que trust [198 to come, at his own option, and without showing actual injury, and *199 insist upon having the experiment of another sale. This is a remedy which goes deep, and touches the very root of the evil.”
The cases of Welsh v. Perkins, 8 Ohio, 52; Armstrong v. Houston’s Heirs, Id. 552; Menchill v. Dunlap, 10 Ohio, 120; Glass v. Greathouse, 20 Ohio, 516; and Rodgers v. Rodgers, Hopk. Ch. 515, sustain very fully the same doctrine. In Armstrong v. Houston, 8 Ohio, it was held that an appraiser at an administrator’s sale, after the appraisement had been approved by the court, and he had no further connection with the case, was incapacitated to purchase; and the sale, for that reason was set aside. This case now under consideration presents," in our opinion, much stronger grounds for relief than existed in that.
An a'ccount between Barrington’s estate and Alexander, as to moneys received and disbursed by the latter as administrator, and also of improvements by him made on the lot, and of rents properly chargeable to him for the use and occupation of the same, may be taken; the property may again be appraised and sold, and out of the proceeds of the sale, Alexander to. be first paid the balance, if any, that may be found due to him, and the residue to be retained by the administratrix, for the use of the estate.
Decree accordingly.
Bartley, C. J., and Brinkerhoff and Scott, JJ., concurred.
Swan, J., dissented.